81 N.Y.2d 600 (1993)
619 N.E.2d 377
601 N.Y.S.2d 440
The People of the State of New York, Respondent,
v.
Eugene Wong, Appellant.
The People of the State of New York, Respondent,
v.
Mary Wong, Appellant.
Court of Appeals of the State of New York.
Argued June 1, 1993.
Decided July 8, 1993.
Lemole, McCarthy, Murphy & Associates, Staten Island (Paul A. Lemole of counsel), for appellants.
Robert M. Morgenthau, District Attorney of New York County, New York City (Mary C. Farrington and James M. McGuire of counsel), for respondent.
Chief Judge KAYE and Judges SIMONS, HANCOCK, JR., and SMITH concur with Judge TITONE; Judge BELLACOSA dissents and votes to affirm in another opinion.
*603 TITONE, J.
Defendants Eugene Wong and Mary Wong were charged *604 with homicide and endangering the welfare of a child as a result of the death of a three-month-old infant who had been entrusted to their care. There was evidence at trial that both defendants were continuously present in the couple's apartment and that one of them had shaken the infant violently enough to produce fatal injuries. However, because neither defendant gave a complete account of what had occurred and, apart from the Wongs' three-year-old son, there were no other witnesses, the People were unable to prove which defendant had administered the fatal shaking. The issue before us on this appeal from the judgment convicting both defendants of second degree manslaughter and endangering the welfare of a child is whether the People's case, as submitted to the jury, provided a sufficient factual basis for holding the defendant who had not shaken the infant as culpable for the infant's death as was the defendant who had actually committed the abusive acts. Under the circumstances of this case, we hold that the evidence offered against these defendants was legally insufficient to support the sole theory the People now advance to justify their conviction.
According to the evidence offered at trial, defendants had been retained to care for the three-month-old infant, Kwok-Wei, as a result of an advertisement they had placed in a local Chinese-language newspaper. The infant's parents, the Jiangs, both worked some 12 hours a day from Monday through Saturday and for that reason felt that they needed the 24-hour care that defendants were offering. The Jiangs were told that defendant Mary Wong would be providing much of their baby's care but that her husband, defendant Eugene Wong, would also be tending to Kwok-Wei's needs. Kwok-Wei was to sleep in a crib that was placed directly next to defendants' bed, which was located in the bedroom of their one-bedroom apartment. The Jiangs planned to visit their child on Sundays, their one day off from work.
The Jiangs' first visit with Kwok-Wei on July 3, 1988 was uneventful. Four days later, however, defendant Mary Wong called the baby's father at about 6:30 A.M. and informed him that Kwok-Wei was dead. Ms. Wong told Jiang that the baby had cried continually from about midnight to about 2:00 A.M. on the previous night, that he had been given some "gripe water" obtained from a Chinese pharmacy, that everyone in the household had subsequently gone to sleep and, finally, that when defendants awoke they found that the baby had "turned black." According to police department records, defendant *605 Eugene Wong placed a "911" call at approximately the same time, requesting an ambulance for an "unconscious" child.
The police officers who responded to this call immediately noticed that defendants were fully dressed and appeared calm. Upon looking around the room, they saw the already dead infant lying in a baby carrier. The child's face was discolored and his limbs were stiff and flexed in conformance to the shape of the carrier.
After the police's arrival, defendants made additional, somewhat inconsistent statements about the events of the preceding night. Defendant Eugene Wong told the paramedics at the hospital that the baby had not been sick and had quieted down after he and his wife had fed him at 1:00 or 2:00 A.M. Wong also told the attending physician that the baby had awakened at about midnight and cried for about 2½ hours, during which time both he and his wife "attended the baby to see what was wrong." According to Wong, Kwok-Wei eventually went to sleep and nothing else occurred until he was checked the next morning, at which point one of the Wongs observed that he was not breathing and had no heartbeat.
While she was at the hospital, Mary Wong asked a police officer whether the child had died and was informed that he had. Nonetheless, she then called Kwok-Wei's father at the officer's request and, in response to Jiang's expressions of disbelief, told him she did not know whether his child was really dead. Several hours later, she spoke to Kwok-Wei's mother, telling her that the child had fallen asleep at about 2:00 or 2:30 A.M. after having cried for two hours and having refused milk and water. Although Wong initially told the infant's mother that Kwok-Wei had not appeared to be ill, she stated in a subsequent conversation that the child had had "cramps" and had been "shaking involuntarily." Wong attributed these symptoms to the mother's prior use of birth control pills or Chinese herbal medicine.
An autopsy performed on the child revealed that he had died as a result of internal brain injuries, including ruptured blood vessels, that could only be attributed to "shaken baby syndrome." That condition occurs when an infant under the age of one is subjected to violent shaking causing his or her head to snap back and forth. Under those conditions, the infant's brain, which is very soft, will move around inside the head, leading to ruptured blood vessels, hemorrhaging and swelling.
*606 "Shaken baby syndrome" is not necessarily accompanied by external injuries. A baby suffering from the effects of a violent shaking would initially cry sharply and then, within about 30 minutes, lapse into a coma that would resemble ordinary sleep to a person who was not watching for the movements that naturally occur during sleep. According to the People's experts, prompt medical attention can prevent fatality in cases such as Kwok-Wei's, although serious permanent injuries, including blindness and intellectual impairment, are almost inevitable.
On the basis of the foregoing evidence, both defendants were indicted and tried on charges of first and second degree manslaughter (Penal Law § 125.15 [1]; § 125.20 [1]) and endangering the welfare of a child (Penal Law § 260.10 [1]). After the People's direct case was presented to the jury, counsel for both defendants moved to dismiss on the ground that the proof had not established that either Eugene Wong or Mary Wong was the person who had caused the infant's fatal injuries. The prosecutor argued, in response, that the People's case rested on the theory that each defendant was independently liable for Kwok-Wei's death because one of them had shaken the baby while the other had stood by and failed to intervene. According to the People's theory, the defendant who had not actually shaken the infant, the "passive" defendant, was equally culpable because of his or her omission in failing to fulfill a duty that was imposed by law.
The trial court adopted the People's argument and declined to dismiss the indictment. The court subsequently charged the jury that it could find the "passive" defendant guilty for failing to act if it determined that that defendant "had a duty to prevent another from harming the infant" or to obtain "proper and prompt medical care" and, having had the requisite mental state, had failed in the performance of that duty despite having had the ability to act. The jury returned a guilty verdict on all counts against each defendant.
On defendants' appeal, the Appellate Division modified by dismissing the convictions for first degree manslaughter on the ground that the finding that defendants had acted, or failed to act, with the "intent to cause serious physical injury" (see, Penal Law § 125.20 [1]) was against the weight of the evidence. The Court, however, rejected the contention that the People's failure to adduce evidence identifying the person who had actually shaken the baby vitiated the entire prosecution. *607 Instead, over a vigorous dissent, the Court ruled that the convictions for second degree manslaughter and endangering the welfare of a child were sustainable because there was sufficient evidence to support a finding that the "passive" defendant had failed to perform a duty imposed by law under any one of a number of diverse theories.
On this appeal, the People have limited their case to a single theory. Eschewing several of the theories advanced by the Appellate Division majority, the People now argue only that the convictions of both defendants should be upheld because there was sufficient evidence for the jury to infer that "one of them shook the baby violently while the other, aware of the harm being done, failed to seek medical assistance." We agree that the People's formula could theoretically support convictions in a proper case. We conclude, however, that in this case the evidence adduced at trial simply does not provide a sufficient factual basis for finding the "passive" defendant guilty of committing second degree manslaughter by an act of omission. Accordingly, although one of the defendants could properly have been found guilty of second degree manslaughter by shaking Kwok-Wei to death, the convictions of both defendants must now be reversed because there was no evidence tending to show which of the two accused individuals was the abusive actor.
Initially, we note that the People's theory against the "passive" defendant is legally sound. Under the Penal Law § 15.10, an individual's criminal liability may be predicated on an "omission." The "minimal" statutory requirement for criminal liability is "conduct which includes a voluntary act or the omission to perform an act which [the accused] is physically capable of performing" (id.). An "omission" is defined as "a failure to perform an act as to which a duty of performance is imposed by law" (id., § 15.00 [3]).
In People v Steinberg (79 N.Y.2d 673, 680), this Court held that parents have an affirmative duty to provide their children with adequate medical care and that, under certain circumstances, the failure to perform that duty can form the basis of a homicide charge (see also, People v Flayhart, 72 N.Y.2d 737). Defendants do not dispute that the same principle may fairly be applied to situations such as this, where adults other than the parents have undertaken by contract to provide 24-hour custodial care for a very young and helpless child and those adults have the physical capacity to take the *608 necessary steps to secure any required medical care. Thus, where the requisite proof is present, a person in the position of the "passive" defendant here may be held criminally liable for failing to seek emergency medical aid for a seriously injured child, and the only remaining question is whether the People produced the necessary proof in this case.
Before discussing the merits of that issue, we must make brief mention of the proper standard for review in a case such as this, where the evidence against the accuseds is wholly circumstantial. In that situation, the People are obliged to prove the accused's guilt to "a moral certainty" and the defendant is entitled to a jury instruction, in words or substance, to that effect (People v Daddona, 81 N.Y.2d 992). On an appeal to the Court of Appeals, however, the proper standard of review is whether the evidence before the jury was legally sufficient to support a finding of guilt beyond a reasonable doubt. The phrase "proof to a moral certainty" is simply "a description of the standard to be applied by the fact finder * * * in the more complex and problematical reasoning process necessarily undertaken in cases of purely circumstantial evidence" (People v Barnes, 50 N.Y.2d 375, 380-381; see also, People v Deegan, 69 N.Y.2d 976, 979 ["the standard that every hypothesis but guilt be excluded to a `moral certainty' is to be applied only by the trier of fact"]; but cf., People v Cleague, 22 N.Y.2d 363). Once the fact finder has made its determination, the "question of law" within this Court's limited power to review the validity of a guilty verdict is whether the evidence, viewed in the light most favorable to the People, could lead a rational trier of fact to find the elements of the crime to have been proven beyond a reasonable doubt (People v Foster, 64 N.Y.2d 1144, 1146; see, People v Bleakley, 69 N.Y.2d 490, 495; see also, Jackson v Virginia, 443 US 307, 319). With that standard in mind, we turn to the evidence adduced at defendants' trial.
Manifestly, the "passive" defendant's "mere presence" in the Wongs' apartment at the time of the crime is insufficient to support a finding of criminal liability (see, e.g., People v Sanchez, 61 N.Y.2d 1022). The People's contention that the "passive" defendant is criminally liable for failing to seek medical help for Kwok-Wei after he was violently shaken requires, at the very least, a showing both that the "passive" defendant was personally aware that the shaking had occurred and that such abusive conduct created a risk that the infant would die without prompt medical treatment.
The second prong of this required showing is plainly problematic *609 in this case. In People v Steinberg (supra, at 681), we observed that, even where the accused has no medical training, "there are situations where the need for prompt medical attention would be obvious to anyone  a child bleeding profusely, for example." Whether that was the case here presents a close question, particularly since the shaking to which Kwok-Wei was subjected produced no external bruises and the symptoms of the internal injuries he sustained could be mistaken for indicia of ordinary sleep.
Even if we were to resolve this question by holding that a rational fact finder could have determined the issue in the People's favor, the People could not prevail because of the absence of proof from which the jury could infer that the "passive" defendant was even aware that the infant had been violently shaken. As to this critical element of their theory, the People rely almost exclusively on defendants' own statements that they had been awake and tending to the child together during the 2½-hour period when the shaking probably occurred. However, this evidence is simply too tenuous a thread to support the weight of the all-important inference of knowledge on the part of the "passive" defendant.
Neither defendant affirmatively indicated in his or her pretrial statements that the two adults had been continuously together during the entire 2½-hour interval. Moreover, it seems more likely than not that at least one of them would have left the room in which the baby was located at some point during the relevant period, if only to use the bathroom or the kitchen. Contrary to the People's argument, it would not have been a "remarkable coincidence" if the shaking just happened to occur when the "passive" defendant left the room. Indeed, it is hardly a remarkable notion that a person inclined to abuse a child would wait until another adult who might interfere had left the room before acting.
Similarly, the fact that the Wongs attempted to exculpate themselves by offering various, patently false explanations for Kwok-Wei's condition did not add materially to the People's case against the "passive" defendant. At most, their clumsy and transparent exculpatory efforts reflected their guilty knowledge that a horrible crime had occurred in their apartment on the preceding night. Because these statements bore no relationship to the events that actually led to the infant's death, they did not shed any light on the "passive" defendant's actual role in that death.
*610 Finally, although the People argue otherwise, the size of defendants' apartment also provides no basis for inferring the "passive" defendant's awareness of the abusive acts. To be sure, the apartment had only one bedroom and the baby's crib was placed directly against defendants' own bed. It is also true, however, that the small apartment had at least three other rooms  a living room, a kitchen and a bathroom  where the "passive" defendant could go. In the absence of any evidence to show how, or at least where, the abusive acts had occurred and which room or rooms the two defendants had been in, there was no basis for the jury to infer that the "passive" defendant had actually witnessed the shaking  a form of abuse that would leave no visible exterior marks. It follows that any conclusion by the jurors that the "passive" defendant actually knew of the abuse would have to have been based on impermissible speculation.
In light of the foregoing, there is no sound factual basis on which to hold the person who did not actually shake the infant criminally responsible for the infant's death. Similarly, the count charging both defendants with endangering the welfare of a child cannot be sustained because, with regard to the "passive" defendant, it too necessarily rests on the unproven premise that that individual was aware of the life-threatening situation in which the infant had been placed as a result of the violent shaking. Apart from the People's medical-omission theory, the only other argument for holding the "passive" defendant guilty of the endangering count is the theory suggested by the Appellate Division majority, i.e., that the "passive" defendant was criminally culpable for knowingly permitting his or her spouse to tend to a crying child in a late-night situation that was likely to provoke abuse. The theory is premised on the evidence admitted at trial to demonstrate that other children entrusted to the Wongs' care had also been abused.
The problem with relying on this theory is, quite simply, that it was not among the theories of liability that were submitted to the jury. Indeed, under the trial court's charge, the evidence of prior incidents of abuse was admitted only for the limited purpose of rebutting a defense of accident or mistake.
Accordingly, we conclude that the convictions of both defendants must be reversed even though that conclusion means that one clearly guilty party will go free. The result in this *611 case is an especially difficult one because of the heinousness of the crime as well as the evident culpability of one of the two appealing parties. Nonetheless, we are duty bound to reverse these two defendants' convictions because the alternative  incarcerating both individuals for a crime of which only one is demonstrably culpable  is an unacceptable option in a system that is based on personal accountability and presumes each accused to be innocent until proven otherwise.
Accordingly, the order of the Appellate Division should be reversed and the indictment against defendants dismissed.
BELLACOSA, J. (dissenting).
I respectfully dissent and vote to affirm the order of the Appellate Division upholding the convictions of the defendants.
This Court reverses defendants' convictions for manslaughter in the second degree and endangering the welfare of a child and dismisses all criminal charges, despite the "evident culpability of one of the two appealing parties" (majority opn, at 611). This incongruous result in a complicated infanticide prosecution is most unfortunate and results, in my view, from misapplication of governing reviewability standards and appellate speculation.
The dispositive question on this appeal is whether the evidence presented to the jury by the People was sufficient to prove that both defendants were present when the so-called "active defendant" shook three-month-young Kwok-Wei to death, and that the "passive defendant" perceived and disregarded the risk of death. I agree that the test is "whether the evidence, viewed in the light most favorable to the People, could lead a rational trier of fact to find the elements of the crime to have been proven beyond a reasonable doubt" (majority opn, at 608; see also, People v Contes, 60 N.Y.2d 620, 621). Where, as here, the evidence is circumstantial, the "conclusion of guilt must be consistent with and flow naturally from the proven facts" (People v Kennedy, 47 N.Y.2d 196, 202). My point of departure from the majority's analysis is whether the People are required to affirmatively and conclusively prove that the passive defendant was present at the precise moment of the fatal shaking (majority opn, at 609). Under this Court's established rubrics of evidence and appellate review, it should be sufficient that the People presented evidence from which the critical conclusions could be rationally inferred beyond a reasonable doubt.
Since the People "prevailed at trial * * * we are required to *612 assume that the jury credited [their] witnesses" (People v Kennedy, supra, at 203). The People established that in order to cause death the shaking had to be prolonged, repeated and violent. While this testimony was contradicted by the defendants' experts, who contended that a single shake could result in death, the acceptance or rejection of expert testimony in these circumstances is exclusively within the province of the jury. The People also established that following a violent, repeated shaking, an infant could suffer seizures or respiratory collapse, and would cry in a shrill, high-pitched tone, before lapsing into a coma. The victim's crib was alongside the bed of the defendants "caretakers". Thus, the inference that the relevant symptoms, in particular the shrill cry, must have been sensed by both defendants is not only reasonable, in this case it is virtually inescapable. At the very least, it is enough to pass appellate review, upon the affirmed portion of a verdict of guilt on a reduced homicide charge, as to the sufficiency of the evidence presented. All of the experts agreed that Kwok-Wei died prior to being placed in the baby carrier and that rigor mortis, which would have taken at least four hours to occur, had set in by 6:30 A.M. Again, the only reasonable inference was that Kwok-Wei died before 2:30 A.M. when, by defendants' own admissions, they were both awake and "tending" to the infant. I conclude that no reasonable, innocent scenario is legally sustainable without resorting to appellate speculation.
The Court's statement that the defendants' statements are "simply too tenuous a thread to support the weight of the all-important inference of knowledge on the part of the `passive' defendant" (majority opn, at 609) is puzzling. The defendants made consistent statements to Kwok-Wei's parents, the Emergency Medical Services personnel and hospital personnel, that they both tended to Kwok-Wei in the living room during the entire 2½ hours that he was crying and they both put him to bed when he stopped crying. The jury could justifiably have inferred from their own joint activity statements that they were "continuously together" (majority opn, at 609) during any or all of the critical events and time periods. Indeed, such an inference of joint conduct is less speculative than the Court's rumination that "it seems more likely than not that at least one of them would have left the room * * * at some point during the relevant period" (majority opn, at 609). This speculation contradicts the unequivocal import of the defendants' consistent admissions.
*613 "`[I]n the end, it is a question whether common human experience would lead'" reasonable persons, putting their minds to it, "`to reject or accept the inferences asserted for the established facts'" (People v Kennedy, 47 NY2d, at 203, supra, quoting People v Wachowicz, 22 N.Y.2d 369, 372). The conclusion reached by the jury that the shaking had to be violent and prolonged and, thus, did not occur while the "passive" defendant was absent, distracted or unaware within the contemplation of the penal statutes, falls within the "common human experience" of reasonable persons and, therefore, should not be disturbed by this Court of last resort.
I believe that the lesser included homicide and the endangerment crimes for which these defendants stand convicted should be sustained.
Order reversed, etc.